COLTRANE v. BALTIMORE BUILDING & LOAN ASS'N OF BALTIMORE CITY.

In re BLAKE.

(Circuit Court, D. Maryland. June 17, 1901.)

1. **BUILDING AND LOAN ASSOCIATIONS—DISTRIBUTION OF ASSETS IN INSOLVENCY —LAW GOVERNING.**

Building and loan associations are the creatures of state statutes, by which their powers and the validity and effect of their contracts are measured; and the mutual rights and obligations of the shareholders of such an association, when it becomes necessary to wind up its affairs and distribute its assets through a court of equity, must be determined by the law of the state of its domicile, where such law has been authoritatively declared by its courts.

2. **SAME—ACCOUNTING WITH BORROWING MEMBERS—STOCK PAYMENTS.**

Under the law of Maryland, settled by decision since 1878, a borrowing shareholder in a building association incorporated in that state cannot be required to contribute to the losses of the association, where his contract has been terminated and his loan matured by the winding up of the association before the maturity of his stock, but in such case he is entitled to credit on his loan for the full amount paid on his stock; and a case is not taken out of the rule because the by-laws of the association provide that losses in excess of undivided profits shall be charged pro rata against the shares in good standing, such provision being for the purpose of determining the withdrawal value of the shares in case of foreclosure or voluntary settlement by the borrower, or the number of payments required to mature his stock, and having no reference or application to the enforced maturing of his stock and loan through the insolvency of the association.

3. **SAME—PREMIUM PAID.**

Where a building association becomes insolvent and is wound up, and the loan of a borrowing shareholder is thereby matured, contrary to its terms, equity requires that each party to the contract be restored as nearly as possible to the position occupied when it was made. The stockholder should be charged with the money received and interest thereon, and credited with all payments made as premium or interest, but he is not entitled to credit for admission fees or fines paid.

4. **SAME—USURIOUS PREMIUMS—MARYLAND RULE.**

The Maryland statute of 1894 providing that it shall be lawful for building associations to collect premiums in installments (Acts 1894, c. 321) does not affect the question whether a premium contracted to be paid is usurious, and under the decisions of the court of appeals of the state a premium arbitrarily fixed without competition, although payable in installments, is in fact only a form of usurious interest and illegal, and the borrowing shareholder is entitled to have the installments paid credited as partial payments on his loan.

In Equity. In the matter of the intervening petition of Charles G. Blake. On exceptions to report of John C. Rose, special master.

The hearing before the special master was at the instance of the petitioner, Blake, who is one of the advanced or borrowing stockholders of the Baltimore Building & Loan Association of Baltimore City; and the matter came on to be heard before the special master upon the issues raised by Blake's petition, and by the answer of the association and its receivers, and upon their cross petition, and was for the purpose of declaring the proper rule for ascertaining the amount now justly due by Blake and by the other advanced shareholders to this insolvent association, the assets of which are now in the hands of receivers appointed by this court, and which is being wound up under its orders. It being obvious that the declaration of the rule of settlement with the petitioner. Blake, would practically affect the

rights of all the stockholders, the special master, in pursuance of the general order of reference to him, gave notice to all stockholders who had filed intervening petitions that he would sit to hear argument on all the questions of law involved in Blake's petition in which they were severally interested. The special master did, in accordance with this notice and subsequent notices, sit from time to time from June, 1900, to October, 1900, giving opportunity to all the intervening petitioners, by their respective counsel, and to the counsel of the complainant and of the receivers, to present their respective contentions both orally and by printed briefs. On the 30th of January, 1901, the special master filed his report, in which, with great care and particularity, he has clearly and learnedly set forth his conclusions, in 71 findings of fact and in 14 conclusions of law, with the reasons therefor. The substance of such of the findings of fact as are at all material to the questions raised by the exceptions filed by Blake and others to the special master's report may be stated as follows: That the Baltimore Building & Loan Association was incorporated under the general laws of Maryland, by a certificate of incorporation recorded April 1, 1891, which was subsequently amended April 20, 1893. That by-laws were adopted which were from time to time amended as in said findings set forth. That Blake, by application in writing, subscribed November 16, 1892, for 10 shares of installment stock of said association, and on November 22, 1892, made application for a loan of $1,000, which was granted to him upon the security of a deed of trust of certain real estate situate in Tucker county, W. Va. That Blake had paid to the association on said 10 shares 87 monthly payments of $6 each, as stock dues from December, 1892, to February, 1900, amounting to $522, and also, as premium and interest, $10 per month, which were receipted for without distinguishing how much was premium and how much was interest, and amounting February, 1900, to $863.32; and he also paid an admission fee of $10. That subsequently, May 17, 1895, Blake procured another loan of $300 on the three shares of stock upon the same security, and made similar proportionate payments on said three shares. That, under the by-laws in force when these loans were made, a fixed charge of 50 cents a month per share, as premium, was made to all borrowing shareholders, irrespective of whether the applications for loans were in excess of funds on hand or not; the premium not being influenced or affected by competition for loans among shareholders. That no profits were ever apportioned among any of the shares, or credited to the account of any shareholder. That by the bonds executed by Blake, and by the deeds of trust, he agreed to pay upon each share advanced to him 60 cents as dues, 50 cents as interest, and 50 cents as premium per month per share until each share should be fully paid in, and of the par value of $100. That, if the association had proved to be a continuously successful concern, its stock would have matured in about 105 months, and the advanced shareholders would have paid about 13 per cent. per annum for the use of the money advanced to them, and the investment installment stockholders would, under the same circumstances, have received as a return on their money the equivalent of 10 per cent. per annum, compounded monthly.

The master finds, as a conclusion of law, that when, on March 21, 1900, on account of the insolvency of the association, the court appointed receivers of its assets for the purpose of winding up its affairs and equitably distributing its assets, the contracts between the association and its borrowing stockholders became impossible of performance, and that the borrowing shareholders by the now undisputed rule of law were entitled to treat their contracts as matured, and to be presently released upon adjusting upon principles of equity and fair dealing the amounts due by them. The special master held that with regard to the question whether the monthly payments of premiums were legally exacted or not this court was bound to follow the decisions of the court of appeals of Maryland, in so far as it had passed upon that question, because this was a Maryland contract, made with a Maryland corporation, whose charter depended upon the statutes of Maryland, and that the decisions of the state court construing those statutes were controlling in the federal court. The court of appeals of Maryland having decided in the case of Geiger v. Association (1882) 58 Md. 569, that an agreement to pay a

weekly premium in addition to 6 per cent. interest was not authorized by the law of Maryland, and was by the law of Maryland usurious, and having held in White v. Williams (decided March 21, 1900) 90 Md. 719, 45'Atl. 1001, with regard to this defendant association, that at the date when Blake's first mortgage was executed there was no law in Maryland authorizing the payment of a weekly premium in addition to legal interest, the special master held that the weekly payments exacted from Blake were usurious, and must by the law of Maryland be credited as payments on the advance to him. The special master in his report dealing with the second loan made to Blake, and which was made subsequently, holds, as a conclusion of law, that even upon shares advanced and mortgages made since the passage of the act of 1894, c. 321, the payments of weekly premiums are usurious, and are to be credited as payments upon principal. The act of 1894 (chapter 321) provides that building associations, instead of receiving the whole amount of such premium as might be agreed upon in advance, or deducting the whole amount of such premiums from the amount advanced, might agree with the borrower that he should pay the premium in such installments as might be agreed upon. The special master, in a very able presentation of the law in support of his sixth conclusion of law, points out that the line of decisions in the Maryland court of appeals, extending through more than 40 years, has held that, although a premium in the nature of a competitive bonus between members of a building and loan association who are bidding for a loan may be lawful, a fixed premium exacted, which is in no way to be distinguished from usurious interest, has never been sanctioned; and the court of· appeals of Maryland has constantly declared that the rate of interest agreed to be paid on the sum advanced cannot lawfully exceed 6 per cent. The special master points out the facts from which the conclusion is to be deduced that the exaction of weekly payments of premium, fixed and uniform, from all borrowers alike, and having no relation to·the demand for money among the shareholders, and without competition, is usurious in states where the law does not expressly legalize it, and in which statutes forbid taking above a fixed and less rate of interest. The special master, under his seventh conclusion of law, holds that when an insolvent building and loan association is being wound up in an equity court, and the contract under which the advance was made has become impossible of fulfillment, and the effort is equitably to adjust the relations of the parties so as to put them, as near as they reasonably can be, in the position in which they were when the contract was made, the great weight of authority supports the rule of settlement by which the advanced member is credited with the money paid the association under the special contract in accordance with which the money was advanced to him, and that therefore both interest and premium, having been paid in his capacity of borrower, are to be credited to him in full, without rebate for any portion of the premium. By his eighth conclusion of law the special master held that the court of appeals of Maryland, in the cases before it in which it ruled that in a settlement with an insolvent or winding-up building and loan association the borrowing shareholder must be credited with stock dues paid by him, had never had a case in which it was made to appear that the by-law contained an express provision that all shares should be charged pro rata with losses, and that therefore there is no Maryland decision which has held, in a case similar to the present case, that the borrowing stockholder must be given credit for the payments made as dues upon stock. And by his ninth conclusion of law, and the reasons in support of it, the special master held the weight of authority in the United States to be in favor of the doctrine that the shares of stock pledged for the advance are like other shares, in this: that they must bear their pro rata share of all losses, and that the borrower can only obtain credit for their value after an ascertainment of the distributive share of the assets to which all shares are entitled. In the special master's report he has stated his principal conclusions of law and his reasons as follows:

"First Conclusion of Law. That on the 21st day of March in the year 1900 the said receivers of the said defendant corporation became entitled to demand from the said Charles G. Blake the immediate payment of such sum as would in equity discharge the said intervening petitioner from all·liability

to the said defendant corporation or its receivers for or on account of the two advances made ,him, and Charles G. Blake became entitled upon payment of the said sum to the said receivers of the said defendant corporation to demand and receive from them a full release.

"Reasons in Support of the First Conclusion of Law. The intervening petitioner bound himself by the bonds and deeds of trust he gave to the defendant corporation to pay to it monthly the sum of $1.60 upon each share of its stock upon which he had received an advance, until said share became fully paid in, and of the par value of $100. Before any one of the said shares had become of the par value of $100 the said defendant corporation became insolvent. This court, through its receivers, took possession of the corporate assets for the purpose of winding up the affairs of the corporation and of equitably distributing the assets. On the 21st day of March, 1900, it therefore became evident that no one of the shares of stock upon which the intervening petitioner had received an advance would ever become of the par value of $100. Only three ways of dealing with such a situation are logically possible: (1) The bonds and deeds of trust do not in terms provide that the insolvency of the corporation shall terminate the payments which the intervening petitioner bound himself to make. If he be held to the literal performance of his undertaking, he will be required to pay forever the monthly installments of dues, premiums, and interest. (2) The purpose of the contracts made by the intervening petitioner has become impossible of fulfillment by something which the law can regard as the default of the defendant corporation. He may therefore be treated as discharged from the obligation of his bonds and deeds of trust, without being called on to account for the money which on the faith of those bonds and deeds of trust the corporation paid to him. (3) The contracts between the parties have become impossible of performance, and therefore neither party can call upon the other to do anything under them. But each party on the faith of these contracts has already done something, and has acquired rights against the other not arising out of the contract, but resulting from the things actually done. These rights it is the duty of the court to protect and adjust upon principles of equity and fair dealing. When such adjustment is made the net sum due by the one to the other is presently payable, and upon its payment all securities given for the performance of the contracts are necessarily to 'be surrendered up to be canceled. The first of the above enumerated solutions of the problems created by the insolvency of the defendant corporation would be grossly unfair to the intervening petitioner; the second, to the defendant corporation. The third involves in theory no injustice to any one, whatever doubt and difficulty there may be as to its practical application. It has accordingly been universally adopted, and is now the settled and undisputed rule of law. Weir v. Association, 38 Atl. 643, 56 N. J. Eq. 234; Kemp v. Wright, L.·R. [1894] 2 Ch. 462; Association v. Zucker, 48 Md. 448; End. Bldg. Ass'ns (2d Ed.) p. 518.

"Second Conclusion of Law. That, in stating the account between the intervening petitioner and the defendant corporation arising out of each of the loans or advances made to him, he should be charged with the amount of said loan or advance, with interest at the rate of six per centum per annum thereon from the date at which loan or advance was made.

"Reasons in Support of the Second Conclusion of Law. The money which the intervening petitioner received as a loan or advance was not his. The contract under which he received it having been abrogated, it never became his. He must, in equity and good conscience, return it. He has had the use of it since it was paid him. It is just that he should pay as compensation for the use of that money what the law holds to be the reasonable worth of such use; that is to say, legal interest thereon. All the cases agree as to the soundness of this conclusion of law, however widely they may differ on other questions. Association v. Zucker. 48 Md. 448; Strohen v. Association, 8 Atl. 843, 115 Pa. St. 273; Towle v. Society (C. C.) 61 Fed. 446.

"Third Conclusion of Law. That, if the premium of fifty cents per share per month exacted of the intervening petitioner by the defendant corporation was illegally exacted, the intervening petitioner is entitled to have the amounts paid by him as such premium credited on his loan as of the date when made, according to the rule governing the application of partial pay-

ments, whatever rule for the settlement of the accounts between the defendant corporation and the intervening petitioner shall be adopted, and whether the defendant is insolvent, as it is, or were solvent and actively engaged in the prosecution of its business, as it is not.

"Reasons in Support of the Third Conclusion of Law. As will be seen hereafter in the discussion of the reasons for the seventh conclusion of law, the great weight of authority holds that when a building association becomes insolvent its advanced members are entitled to credit for all the premiums paid by them, whether such premiums were or were not legally exacted. The leading case of the few which take a different view is Towle v. Society (C. C.) 61 Fed. 446. By that decision, and by those which follow it, the premiums paid by advanced members are apportioned upon the theory that some part of them had been equitably earned by the association prior to its becoming insolvent. For those portions which had been so earned the advanced members are held not entitled to any credit, while they are given credit for such portions as had not been earned by the association up to the time of its ceasing to do business. As was pointed out by the circuit court of appeals for the Sixth circuit, no question of apportionment can arise unless the premium was lawfully exacted, and when the premium was not lawfully taken it followed, in the language of the court, that all of it must be 'credited against the loan.' Douglass v. Kavanaugh, 33 C. C. A. 107, 90 Fed. 374. In an able and ingenious brief which Mr. Culbreth, of counsel for the receivers, has filed with the special master, it is argued that, even if it be held that the defendant corporation had no legal power to demand the premium it did demand from the intervening petitioner, still the intervening petitioner is not now entitled to have such premium in effect repaid to him by crediting its amount upon his loan. It is said that the relations between building associations and their members are such that any contracts made between them cannot be usurious, in the strict sense of that term. It is admitted that a building association cannot enforce any contracts into which the legislature has not given it power to enter. But it is said that, if the other party nevertheless makes payment under such unenforceable contract, he cannot recover back that which he has paid under a mistake of the law. Usury may be recovered back, because its collection was in defiance of the settled policy of the state. It is urged that premiums which the association had not been given power to demand cannot be recovered, because their collection, if illegal at all, was illegal only in the sense that the law had failed to confer upon the association any power to enforce their payment. If without such power the association actually succeeded in collecting them, Mr. Culbreth asserts that there is no legal warrant for compelling their return to the members who paid them. If this were a question of first impression, it might be sufficient to say that the reasons which have led legislatures to put limits upon the legal powers of building associations to accept premiums, when such limits have been in fact imposed, are precisely the same reasons, good or bad, which have inspired all statutes against usury, and that therefore they should be given precisely the same effect as would be given to the prohibitions against usury. The matter is not, however, one of first impression. It has been decided over and over again, and always in the same way. A long line of building association cases in Maryland has determined that premiums illegally exacted from the advanced members by the association are usurious. Being usurious under the law of Maryland, and the entire transaction of which their payment was an incident not having been finally closed, they must be credited on the principal. Association v. Hayes, 61 Md. 597; Same v. Hilleary, 68 Md. 52, 11 Atl. 505. In this respect the Maryland law is not peculiar. Everywhere throughout the country the courts have refused to recognize the distinction sought to be made by Mr. Culbreth. Wherever the association took more interest than it was authorized to take, no matter by what name it called the excessive exaction, or whether such exaction was illegal because in terms forbidden, or was illegal merely because the statute had not given the association power to take it, such interest has uniformly been treated as usury, and has been dealt with in whatever way the local statutes and decisions required that usury should be dealt with. Falls v. Building Co., 13 South. 25, 97 Ala. 417, 24 L. R. A. 174; Association

v. Wilcox, 24 Conn. 147; Wilcoxon v. Smith, 78 N. W. 217, 107 Iowa, 555; Association v. Kidder, 58 Pac. 798, 9 Kan. App. 385; Association v. Johnson, 10 S. W. 787, 88 Ky. 191, 3 L. R. A. 289; Sullivan v. Association, 12 South. 590, 70 Miss. 94; Moore v. Association, 74 Mo. App. 468; Melville v. Association, 33 Barb. 103; Association v. Keeney, 77 N. W. 442, 57 Neb. 94; Mills v. Association, 75 N. C. 292; Bates v. Association, 42 Ohio St. 655; Kupfert v. Association, 30 Pa. 465; Association v. Bollinger, 12 Rich. Eq. 124, 78 Am. Dec. 403; Graham v. Association (Tenn. Ch. App.) 52 S. W. 1011; Jackson v. Cassidy, 4 S. W. 541, 68 Tex. 282; Crabtree v. Association, 29 S. E. 741, 95 Va. 670; Pfeister v. Association, 19 W. Va. 676; Rhodes v. Loan Co. (Ill. Sup.) 50 N. E. 998, 42 L. R. A. 93.

"Fourth Conclusion of Law. That in determining whether the premiums exacted from the intervening petitioner by the defendant corporation, and paid by him to it, were legally exacted, this court will follow the decisions of the courts of Maryland.

"Reasons in Support of the Fourth Conclusion of Law. The defendant is a Maryland corporation. It derives its existence from the laws of Maryland, and has no powers other than those conferred upon it by those laws. The construction which the court of appeals of Maryland places upon the statutes of Maryland is binding on this court. It is clearly settled that the decision of state tribunals as to what contracts are under the state laws usurious are binding upon the federal courts. Whenever the latter have been called on to determine whether a premium charged by a building association has been legally exacted or not they have uniformly recognized that the state decisions are binding upon them. Frower v. Insurance Co. (U. S. circuit court for the Western District of North Carolina, Simonton, J.) 86 Fed. 748; Douglass v. Kavanaugh, 33 C. C. A. 107, 90 Fed. 373 (C. C. A., Sixth Circuit). The rule was affirmed and applied by the circuit court of appeals for the Eighth circuit, which said, 'If we were at liberty to consider this case upon principle, and apart from the laws of Alabama, we might find it difficult to answer counsel's contention. But the validity and legal effect of this contract must be tested by the laws of Alabama, and the decisions of the supreme court of that state construing those laws, and not by the laws and decisions of other states. Applying that test, we find that under the laws of Alabama, as construed by the supreme court of that state, the contract in suit is not usurious.' Association v. Rector, 38 C. C. A. 686, 98 Fed. 171.

"Fifth Conclusion of Law. That the premium of fifty cents per share per month exacted from the intervening petitioner by the defendant corporation, and paid by him to it, upon the advance of $1.000 made to him on the 21st day of December, 1892, was illegally exacted from him, and the demand and payment thereof were in the nature of the demand and payment of usurious interest; and the loan then made not having been finally settled, and the transaction closed between the parties, the intervening petitioner, independent of the insolvency of the defendant corporation, or of what rule shall be adopted for the settlement of accounts between the advanced members and the insolvent corporation, is entitled to a credit on said loan for such premium when and as paid, in accordance with the rule governing the application of partial payments.

"Reasons in Support of the Fifth Conclusion of Law. Prior to the enactment of the act of 1894 (chapter 321) the authority of a building association to exact a premium was derived from the provisions of sections 6 and 7 of chapter 148 of the Acts of 1852, codified as sections 98 and 99 of the Code of Public General Laws (1888). These sections authorized the association to make an advance to a member for such premium as might be agreed upon. They did not authorize it to take security for the payment of any other than the unpaid installments on the shares redeemed, and interest at 6 per cent. on the money advanced. The court of appeals so held eight years before the charter of the defendant corporation was granted. Geiger v. Association, 58 Md. 569. Geiger's Case was followed in White v. Williams, 90 Md. 719, 45 Atl. 1001, argued before, but decided a few days after, the filing of the complainant's bill in this case. The mortgage before the court of appeals in the last-mentioned case had been made to the defendant corporation. It was there held that the act of 1894 had no effect upon contracts made prior

to its passage. Premiums taken subsequently to its enactment for advances previously made were equally illegal with those which had been collected before it became a law. Such premiums were therefore directed to be credited as partial payments on the original advance. Forty-six years ago the supreme court of Connecticut placed the same construction on statutory provisions substantially identical. Association v. Wilcox, 24 Conn. 147.

"Sixth Conclusion of Law. That the premium of fifty cents per share per month exacted from the intervening petitioner by the defendant corporation, and paid by him to it, upon the advance of $300 made to him on the 21st day of June, 1895, was illegally exacted from him, and the demand and payment thereof were in the nature of the demand and payment of usurious interest; and the loan then made not having been finally settled, and the transaction closed between the parties, the intervening petitioner, independently of the insolvency of the association, and of whatever rule shall be adopted for the settlement of the accounts between the advanced members and the defendant corporation, is entitled to a credit on his loan for such premium when and as paid, in accordance with the rule governing the application of partial payments.

"Reasons in Support of the Sixth Conclusion of Law. The first Maryland statute authorizing the formation of building associations was the act of 1852 (chapter 148), and that act, except in so far as it was amended by the act of 1894 (chapter 321), is still, in substance, in force. The statute has always provided that the corporation may 'advance to any member thereof for such premium as may be agreed upon the sum which he would be entitled to receive upon the dissolution of the corporation * * * or to purchase from any member thereof the shares or any number of shares of stock held by him at such price or sum as according to the articles of association such member may agree to receive.' Since 1894 it has been lawful to collect the premium in installments. All the enactments on the subject (that of 1894 as well as its predecessors) have expressly declared that the interest to be paid by the advanced member shall be at the rate of six per cent. per annum on the sum advanced. More than sixteen years before the charter of the defendant corporation the court of appeals of Maryland had decided that interest could be collected only on the sum actually advanced: that is to say, upon the sum the borrowing member received after the premium had been deducted. Thus, where, upon a nominal advance of $3,600, $900 was retained as premium, the court held that interest could be legally exacted on $2,700 only, and that, it having been actually taken on $3,600, the transaction had become usurious. Society v. Taylor (decided Feb. 11, 1875) 41 Md. 409. This case has never been qualified, or its authority questioned or shaken. The courts have always refused to permit any evasion of this law. In March, 1879, twelve years before the defendant corporation was chartered, the court of appeals held that where the unredeemed shares were required to pay but twenty-five cents per share a week, and the redeemed or advanced shares fifty cents a week, the extra twenty-five cents per share must have been charged for interest, and, if that were so, it was 'clear there has been usury taken.' Association v. Jaecksch, 51 Md. 198. In July, 1882, or nearly nine years before the defendant corporation received its charter, there was before the same court a building association contract legally indistinguishable from that made by the defendant corporation with the intervening petitioner. In that case the advanced member bound himself to pay fifty cents per share as weekly dues and thirty cents per share as weekly premium until the maturity of his stock. The premium of thirty cents per share was provided for by the association's constitution, and exceeded six per cent. on $200, the amount actually advanced on each share, by nearly seven cents per week. The court said: 'In this case the word "premium," and the charge for it, can only be regarded as meaning interest, and, to the extent that the charge exceeds the rate of six per cent., it cannot be allowed.' Geiger v. Association, 58 Md. 569. Among other cases in which the court of appeals of Maryland has declared illegal schemes for securing more than six per cent. interest on the money actually advanced, are the following: Association v. McCarthy, 57 Md. 555, decided February 9, 1882; Association v. Thursby, 58 Md. 284, decided April 13, 1882; Association v. Hayes, 61 Md.

597, decided March 26, 1884; Same v. Hilleary, 68 Md. 52, 11 Atl. 505, decided December 9, 1887. The opinions in all of these cases, as the dates above given show, were announced years before the defendant corporation was organized. The same principle has been applied in the recent case of Association v. McKenzie (decided Feb. 18, 1897) 85 Md. 132, 36 Atl. 754. The contract passed on in the last-mentioned case was entered into subsequent to the passage of the act of 1894 (chapter 321). The court of appeals referred to that act, but did not suggest that its passage had in any wise restricted the scope and effect which had been given by prior decisions to the prohibition against taking more than six per cent. interest on the money advanced.

"It is, of course, clear that the practical effect of the contract between the intervening petitioner and the defendant association would have been precisely the same as it was under the contracts actually made had the advances been made to him on condition that he should continue to pay his regular dues on his stock, and twelve per cent. interest on the money advanced him. He would have paid precisely the same money at precisely the same time, and the money he paid would have been applied by the defendant corporation in precisely the same way. But, if the parties in their contract had called the premium 'interest,' its collection would have been clearly illegal. Did styling it 'premium' make it legal? For forty-eight years the general assembly of Maryland has been careful, in every revision of the building association law, to insert the provision that the interest to be paid shall be at the rate of six per cent. per annum. Was all this trouble taken to insure that the word 'premium' should be used in building association contracts instead of the word 'interest'? Even if this were a case of first impression, the respect which this court must have for the legislature of one of the states of the Union would prevent it from assuming that anything so useless and absurd had been done. The legislative purpose is plain. It is to protect the advanced member from any requirement to make a disproportionate contribution to the profits of the unadvanced members. This is not a case of first impression, however. In the long chain of decisions already cited, the highest judicial tribunal of the state of Maryland has said over and over again, in effect, that the legislature of its state intended by the proviso in question to limit to a sum equivalent to six per cent. on the sum advanced the collection from the advanced stockholder of anything the payment of which has the same practical effect as between the parties as the payment of interest would have. What the money so collected is called is immaterial. What it is, is the only question to be considered. A premium may be collected. Since the act of 1894 it may be paid in a lump sum or in installments. More than six per cent. interest cannot be taken. These provisions must be so construed as to give effect to each of them. How can this be done? In other words, what is the real distinction between a legal premium and illegal interest? The act of 1894, by legalizing the installment premium, and retaining the provision against excessive interest, demonstrates that such distinction is not to be found in the time and manner in which the premium may be paid. The evidence offered by the defendant corporation and its receivers is conclusive to the same effect.

"What follows? It is quite obvious that it does not follow, as contended by the receivers, that the premium exacted from the intervening petitioner was legal. To so hold would be to strike out of the statute the limitation upon the rate of interest which may be lawfully taken. That cannot be done. There is no escape, therefore, from the conclusion that a gross deducted premium otherwise indistinguishable from the premium paid by the intervening petitioner would be a premium which could not be lawfully taken or retained. It could not be, because to take it amounts to receiving interest at the rate of thirteen per cent. on the sum advanced, when the statute allows only six per cent. to be charged. On the other hand, it is, of course, true that the mere fact that the premium, when added to the interest, makes the advance in effect cost the borrowing member more than six per cent. per annum, is not conclusive of its illegality. To so hold would be to ignore those provisions of the statute which expressly authorize the taking of the premium. It is clear, therefore, that the rate of the premium does not determine its validity, any more than does the manner of its payment. Wheth-

er its taking is forbidden or permitted must, then, depend upon what it· is given for. If it is paid merely for the use of money, it is forbidden, if its effect is to make the member obtaining the advance pay for that advance at a higher rate than six per cent. per annum. If it is compensation for a preference given the advanced member over some or all of his fellow members, it is permitted. The counsel for the receivers say that the premium paid· by the intervening petitioner was paid not for the use of the money advanced to him, but for the preference given him in redeeming his shares before their maturity. It is admitted that there was no other preference than that necessarily involved in the redemption of the shares. It was expressly stipulated that at the time the intervening petitioner received his advance no other member was seeking one. The statutory limitation upon the rate of interest is by its terms applicable to advances made for the redemption of shares. To hold that such redemption is in itself sufficient to take the transaction out of the restrictions of the act is in effect to construe the statute with the limitations in precisely the same way as it would be construed if those limitations were not in. This cannot be done. The borrowing member is not necessarily preferred when an advance is made to him. When he is preferred, it is not over those members who do not want to redeem their shares, but only over those who do, and are postponed to him. There can be no preference, except among competitors. The member who takes an advance confers a benefit on the member who does not want one. It is to the interest of the latter that all the money of the association shall be constantly out at interest. If it be idle, he and all the other members are losing the value of its use. The association is in theory of law a mutual one. It exists for the benefit of all its members, and, so far as may be, for their equal benefit. The counsel for the receivers contend that, while all this· is true, yet the free shareholders can say to their fellow members: 'You want an advance, and we want you to have it. If you do not take it, no one else will, and we will all lose. Yet, as you want it and must have it, we will charge you in addition to that interest, which is the reasonable worth of its use, and which would be all that the law would suffer us to take from any one not a member of our association, an extra sum which we can legally exact from you because you and ourselves are fellow· members of a purely mutual association.' If he replied that he could not see where the mutuality came in, they would explain to him that all the interest and all the premium he paid would go into the common fund, to· be divided as profits, the practical result of which division would be that, while an outsider would borrow at six per cent., he would have to pay in the first instance perhaps fourteen per cent. and would then, because the association was mutual, get back enough of what he had paid to reduce the actual cost to him to about thirteen per cent.

"Such, in its last analysis, is the contention of the learned counsel for the receivers on this point. Because a building association is or ought to be a purely mutual society is no reason why it should be allowed to charge an arbitrary premium. It is in fact the most persuasive of all circumstances to show that no such premium should be permitted. Building associations may have other uses than those resulting from their mutual character. The method of repayment of their advances which their schemes permit may be of great benefit to certain classes of the community. In some localities it may be that it would not be economically possible to carry on such associations, and to make loans repayable in installments extending over a long period of time, unless they were permitted to charge more than the legal rate of interest. Where such conditions prevail the remedy must be sought from legislation. In a number of states statutes have been passed, of which that of Indiana is a fair type. It provides 'that it shall be competent and lawful for the borrower from such association to agree in writing upon a given rate of premium in addition to the interest to be paid upon each loan without bidding. All contracts heretofore made between any borrower and any such association for the payment 'of any premium with or without any bidding are hereby legalized. No premiums heretofore contracted for without bidding or to be contracted for under this section shall be deemed usurious.' Burns' Supp.

Ind. 1897, § 4463i. Where such statutes exist, the only question remaining open is whether the legislature enacting them had power under the constitution of its state to do so. That question has been variously decided in different states, but is of no relevancy here, as the general assembly of Maryland has never attempted to pass any such law. In a number of cases in which building association contracts have been attacked as usurious, their validity has been upheld upon the ground that the nature of the transaction and the relationship between the parties was such that usury, in its old and strict sense, could not arise out of it between them. The result arrived at in most of these cases was, on the facts, right. It was true that the character of the contracts in the particular cases examined showed that they were not usurious. An excellent type of such a case is Robertson v. Association, 10 Md. 397, 69 Am. Dec. 145. It is probably not true that these courts ever intended to decide that no bargain made between the association and an advanced member could be usurious. If they did, they are to that extent no longer law, as the citation of authorities in the discussion of the reasons in support of the third conclusion of law demonstrates. In a few jurisdictions, of which Maryland is not one, the language of these early cases has been construed to mean that such an association can lawfully take any character of premium it sees fit to ask, and the borrowing member agrees to give. It is believed, however, that in every one of the states in which such doctrine exists there is either an entire absence of legislation upon the subject, or else, as is in such states more frequently the case, a statute like that of Indiana already cited, expressly declaring that no such contract shall be held usurious. Where such statutes exist and are constitutional, it makes no difference how the premium is fixed or how large it is, just because in those states it makes no difference whether the charge for interest is above the legal rate or not. It is not believed, however, that any well-reasoned case has ever held that where, as in Maryland, a statutory restriction has been placed upon the rate of interest which may be lawfully charged, an arbitrary premium in addition to the maximum legal rate of interest can be exacted. The special master has not been able to find a single such case under such a statute in which the point has been raised and decided adversely to the conclusions herein reached. It is very probable that even in Maryland some of the premiums which have been upheld were fixed arbitrarily, and not as a result of a competition in which one would-be borrower was preferred to another. But, if so, no objection was taken as to the absence of competition, and no decision on the subject was made. On the other hand, it has been held under statutes which are in substance similar to those of Maryland that all noncompetitive premiums are illegal and forbidden. Bates v. Association, 42 Ohio St. 655; State v. Greenville Bldg. & Sav. Ass'n, 28 Ohio St. 92; State v. Oberlin Bldg. Soc., 35 Ohio St. 258. In a well-considered Tennessee case the court pointed out that it was not, under the constitution of Tennessee, in the power of the legislature to authorize a noncompetitive premium, because such a premium was nothing but usurious interest under another name. The same case holds that a competitive premium was in its nature a different thing from interest, and that the legislature could and had permitted its collection. Patterson v. Association, 14 Lea, 677. The same question is considered in Wilcoxon v. Smith, 78 N. W. 217, 107 Iowa, 555. Of course, there is no question that, where the statute directs that the premium shall be determined by competitive bidding, any other way of fixing it is illegal. Myers v. Association, 75 N. W. 944, 117 Mich. 389; Moore v. Association, 74 Mo. App. 468; Stiles' Appeal, 95 Pa. 122.

"The reason why a noncompetitive premium is not lawful, and that a competitive one is permissible, lies in the very nature and purpose of the original building association. Such associations were at first made up of persons who lived in the same neighborhood. They all knew each other, or had the means of easily learning all about each other, and about the property which was offered as security for advances. All or the large majority of them became members with the object of speedily obtaining through the association a home for themselves. Under such circumstan-

ces it was inevitable that in the earlier years of any such association there would always be more members seeking advances than there would be idle money in the treasury to loan to them. The association being mutual, every member who wanted an advance had as much right to it as any of the others; and yet, when more wanted an advance than could get, some rule of selection among them had to be adopted. There were only three ways of choosing among applicants: By order of application, by lot, or by giving the preference to that member to whom the advance would be of the greatest use. In theory, the last method was the one most in harmony with the purely beneficial and fraternal character of the association. Some of the members were so situated that they could wisely and prudently afford to pay more for an advance than others, just because they could use the money so advanced to greater advantage than could the others. If all the members acted with wisdom and discretion, each was the best judge of what he could afford to pay to get an advance at any particular time. He who needed the assistance most received it, and, in return for the preference his fellows accorded him, he, in the true spirit of mutuality and fraternity, contributed to the common stock the value he himself placed upon what he had received. The discussion of this subject in the best of the text-books leaves little to be added. End. Bldg. Ass'ns (2d Ed.) § 409. The interest of all the members of such associations, investing as well as borrowing, requires that the rule against arbitrary noncompetitive premiums shall be maintained. If the savings of the investing members are to be at once profitably and securely employed, there must be a constant and natural demand for loans. The fixing of an arbitrary premium, which is required of all under all circumstances, restricts the demand, and tends to result in the accumulation by the association of large sums of idle money. Such a condition of things must be costly, and may become disastrous. The managers are forced to go out and seek people who are willing to become members, take advances, and pay for them the rate which the association requires, thus reversing the natural order of things, under which the borrower should seek the lender. Now, it is only in special circumstances, and to persons peculiarly situated, that such a loan as the defendant corporation was willing to make can be of any advantage, costing, as it did, something more than twice the legal rate for money. When the agents of the associations are seeking borrowers, they often induce persons to enter into association contracts who ought not to do so. Such people soon become dissatisfied. They complain that they did not understand their bargain. They say, and doubtless not infrequently truthfully say, that its real meaning and effect were misrepresented to them. They claim that they did not become in any real sense members of the association, but were mere borrowers from it. They refuse to perform their contract, and the association becomes involved in litigation, expensive and harassing, and in the end dangerous. Moreover, when the association is seeking borrowers, instead of borrowers seeking the association, the latter does not and cannot scrutinize the security offered as it would do if the usual course of things had been maintained. Loans are made on insufficient security. Moreover, when the association is hunting the borrowers the expenses of management will be much greater proportionately than where the reverse is the case. To these three causes are due the insolvency of most of the building associations which have come to grief, and which have not suffered from the absolute fraud of their officials. It is quite evident that in the case before us all these three causes operated. They would have been far less effective had the association offered its money among its members at the legal rate of interest when there were not more applicants among the members than there was money to lend, or at such premium in addition to interest as the applicants might have fairly bid among themselves when there happened to be more applicants than there was money. The modern so-called national association, of which the defendant corporation was a type, is a very different thing from the original association with which the earlier cases dealt. The defendant corporation was to a considerable extent in fact, whatever it was in legal theory, a mortgage loan company. Capitalists

invested hundreds of thousands of dollars with it. For years some of them received eight per cent. per annum clear of all taxes, and others six per cent., on sums which varied from time to time, but averaged at all times upwards of half a million of dollars. Most of the free or investing stockholders did not join the association with any idea of ever becoming borrowers, and they never did. To them, if the association could be carried to an ordinarily successful conclusion, would have been paid ten per cent. compound interest. To carry on a business so extensively distributed over a great expanse of territory requires an extensive staff of permanent officials. Some of these, if the adventure is to have any chance of success, must be men of exceptional ability, whose services can be secured, if at all, only by the payment of large salaries. Many special attorneys, agents, appraisers, and so on, must be from time to time employed, and large traveling and other expenses incurred. All these profits, exceeding as they do the legal, and sometimes very greatly exceeding the market, rate for money, and all these expenses, must come out of the borrowing members. It therefore becomes necessary to so arrange the scheme of the association that the borrowing member shall be required to pay in any event for the use of the money of the paid-up and the free installment stockholders more than twice the legal rate of interest. If bad fortune comes, he must pay much more, but in any probable event he will have to pay at least that much. So far as concerns the relation of the paid-up stockholders to the borrowing members, the association as actually conducted was in no sense mutual. Under the system of arbitrary premiums at the rate charged by the defendant corporation. the relations between its borrowing and its investing installment stockholders were mutual only in one sense. It is to the advantage of each of them that the association shall succeed, because if it does succeed the free shareholders will get ten per cent. or more compound interest, and the advance shareholders will not have to pay more than thirteen per cent. If the maturity of the stock is protracted beyond the normal period, the rate of interest to be received by the free shareholders will be less, and the rate of interest to be paid by the borrowing shareholders will be greater. Upon principle and authority alike the premiums collected by the defendant corporation from the intervening petitioner were illegally exacted, and should be credited on his loan. The decision in the case of Robertson v. Association, 10 Md. 397, 69 Am. Dec. 145, has in this case been repeatedly cited as laying down principles which justified the exaction of arbitrary premiums, excessive interest, or any other demand which the association might make upon a member seeking an advance. In that case all that was decided was that the association might lawfully continue to charge six per cent. interest upon the full amount advanced until the maturity of the stock. In effect, that case decided nothing more than that the borrowing member had no right to claim credit on his loan for the payments of stock dues made by him when and as he made them. He could not claim to do this because he was a partner or a quasi partner with the free shareholders. Each of them had contracted to pay in their stock dues until the shares mature. The free shareholders were not entitled to draw interest on their stock payments. and consequently the borrowing shareholders had no right to receive interest on their payments upon the same account. It is clear that, if the borrowing members were allowed a reduction of interest on their loans on account of the payments made by them on their shares, they would in effect receive interest on those stock payments. To that they were clearly not entitled, and could not be so long as the association was a mutual institution. Whatever might have been said or argued from Robertson's Case in former years, it has not been possible since 1882, when the case of Association v. McCarthy, 57 Md. 555, was decided, to construe it otherwise than it has been above construed, and the year 1882 was nine years before the defendant corporation was chartered.

"Seventh Conclusion of Law. That, the defendant corporation being insolvent and in process of being wound up in equity, the intervening petitioner is entitled to have credited on his advances from the defendant corporation all the sums he has paid to the said defendant corporation as pre-

mium or interest for or upon said advances, or either of them, even although all of said premium and said interest had been legally exacted and collected.

"Reasons in Support of the Seventh Conclusion of Law. The contract or loan or advance has become impossible of fulfillment. It is rescinded, and all that it is possible to do is to restore the parties to the contract to the position in which they respectively were when they made it. As the only thing which passed from one to the other was money, this process of return can in theory be readily carried out. The corporation or its receivers can get back the money it lent to the advanced member, and he can get back the money he paid the association under the contract by which he borrowed it. If each pays or allows the other interest for the time during which it or he had any of the other's money in his possession, the parties will, in theory of law, be restored precisely to the position in which they were when they made the contract. It is true that in fact it may be the position of neither party will be precisely the same after the rescission is made and the repayments accomplished as it would have been had the contract never been entered into at all. The corporation, on the one hand, has supposed that the premiums paid to it had become in all events and for all purposes its property, and in making up statements of its profits it has assumed that these premiums had become irrevocably its own. Many members had, between the time when the intervening petitioner obtained his advance and the time when the receivers were appointed in this case, withdrawn from the association. The settlement made by the corporation with these withdrawing members would doubtless have been different had the corporation supposed that its title to the premiums which had been paid in by the petitioner and other advanced members was still uncertain, and subject upon a contingency to be defeated. On the other hand, the intervening petitioner and the other advanced members would doubtless have ordered their own affairs differently had they supposed that they might suddenly be called upon to repay at once, in a lump sum, that which they had not expected to be called upon to return, except in installments extending over a considerable period of time. Such circumstances are not susceptible of being made the basis of legal adjustment. The law has long ago determined that, in its eye, interest is full compensation for the use of money, and, if he who is entitled to receive money does not get it when he has a right to ask for it, his injury is made good if he finally receives it with interest for the time during which he should have had possession of it, but did not. Conversely, if one man has had the possession of money belonging to another, he has made that other whole when he gives him back his money with interest upon it. The overwhelming weight of authority supports the conclusion of law above stated. It is the well-recognized law in the following states: (1) Connecticut. Curtis v. Association, 36 Atl. 1023, 69 Conn. 6. (2) Indiana. Marion Trust Co. v. Edwards Lodge Trustees, 54 N. E. 444, 153 Ind. 96. (3) Georgia. Association v. Goodrich, 48 Ga. 450. (4) Iowa. Wilcoxon v. Smith, 78 N. W. 217, 107 Iowa, 555. (5) Kentucky. Rogers v. Rains, 38 S. W. 483, 100 Ky. 295. (6) Maryland. Association v. Zucker, 48 Md. 448. (7) Michigan. Russell v. Pierce, 80 N. W. 118. (8) Minnesota. Knutson v. Association, 69 N. W. 889, 67 Minn. 201. (9) Missouri. Brown v. Archer, 62 Mo. App. 277. (10) New Hampshire. Bank Com'rs v. Granite State Provident Ass'n. 68 N. H. 554, 44 Atl. 605. (11) New Jersey. Weir v. Association, 38 Atl. 643, 56 N. J. Eq. 234. (12) North Carolina. Strauss v. Association, 23 S. E. 450, 117 N. C. 308, 30 L. R. A. 693. (13) North Dakota. Hale v. Cairns, 77 N. W. 1010, 8 N. D. 145. (14) Pennsylvania. Strohen v. Association, 8 Atl. 843, 115 Pa. 273. (15) South Carolina. Buist v. Bryan, 21 S. E. 537, 44 S. C. 121, 29 L. R. A. 127. (16) Tennessee. Rogers v. Hargo, 20 S. W. 430, 92 Tenn. 35. (17) Texas. Blakeley v. Association (Civ. App.) 26 S. W. 292. (18) Utah. Hale v. Thomas, 59 Pac. 241, 20 Utah, 426. (19) Wisconsin. Leahy v. Association, 76 N. W. 625, 100 Wis. 555. And by the following federal circuit courts: Western district of North Carolina. McIlwaine v. Iseley, 96 Fed. 62; Lauer v. Association, 96 Fed. 775. Southern district of Alabama. Manorita v. Trust Co., 101 Fed. 8. It is the rule approved in End. Bldg. Ass'ns (2d Ed.) p. 530, § 531. The authorities affirming and applying this

rule are now much more numerous and weighty than they were when the last edition of Mr. Endlich's book went to press.

"The only dissent from the above conclusion of law is to be found in Towle v. Society (C. C.) 61 Fed. 446, and in the few cases which follow that decision. In his opinion in that case, Judge Grosscup, sitting in the United States circuit court for the Northern district of Illinois, held that where an insolvent association was being wound up in equity, and a gross deducted premium had been paid, there should be an apportionment of the premium; the advanced member being credited with only that portion of it which had not been earned at the time the association went into the hands of receivers. It so happened that the Illinois statute assumed that eight years was the normal duration of a building association, and gave a statutory right to an advanced member who desired to pay off his advance before the maturity of his stock to demand on doing so the return of such portion of the premium as the period yet to elapse before the loan was eight years old bore to eight years. Judge Grosscup followed the analogy of this statute, and held that he would allow credit to the borrowing member only for that portion of the premium which, had the association been a going concern, the borrower would have had the right to demand should be returned to him had he withdrawn at the date the association became insolvent. Judge Baker, sitting in the United States circuit court for the district of Indiana, subsequently, in a case arising out of the winding up of the same building association as that in the course of which Judge Grosscup had made his decision, followed Judge Grosscup's ruling, as, indeed, every reason of courtesy, judicial comity, and expediency required he should. Sullivan v. Stucky (C. C.) 86 Fed. 491. It has never been applied by any other of the federal courts. It has not as yet been adopted by the courts of last resort of any of the states, although it has been followed by the intermediate appellate courts of Illinois in the cases of Choisser v. Young, 69 Ill. App. 252; Sullivan v. Spaniol, 78 Ill. App. 125; Dooling v. Davis, 84 Ill. App. 393. In all the above cases, as in Towle's Case, the premiums were competitive. The supreme court of New York has followed Judge Grosscup in the case of Harrison v. Cobb, 63 N. Y. Supp. 738. I have not been able to discover that it has been elsewhere applied. The decision in Towle's Case was rendered in March, 1894. Since that time the highest courts of Connecticut, Indiana, Iowa, Kentucky, Michigan, Minnesota, Missouri. New Hampshire, New Jersey, North Dakota, Utah, and Wisconsin, or twelve states in all, have been called on for the first time to lay down the rule which they would follow in the winding up of an insolvent building association. In all or nearly all of these cases it appears that the decision in Towle's Case was called to the attention of the court. In none of them was it followed. There was nothing in the previous decisions in any of those states to have prevented the adoption of its doctrines.

"The advanced member is entitled to credit premiums legally as well as those illegally paid by him. The decisions in the above-cited cases in many instances were made with reference to premiums which had been legally exacted. There is probably no state which has gone further in upholding such premiums than has Indiana. The statute (Act March 11, 1875) in that state declares that 'premiums, fines and interest on premiums shall not be deemed usurious.' In the case of McLaughlin v. Association, 62 Ind. 264, the court said that the provisions of this section of the statute did not change the law as it previously existed, for, if the nature of the transaction was in fact usurious under the then constitutional provisions of the state, the legislature had no power to make it innocent. McLaughlin's Case has been followed by a number of cases, and is the established law of Indiana to-day. Association v. Elbert, 54 N. E. 753, 153 Ind. 198. And yet in the case of Huter v. Trust Co., 54 N. E. 755, 153 Ind. 204, the Indiana court said: 'The insolvency of the association would have abrogated the stock and loan contract.' 'The association would be treated by the court as though the contracts had never existed. Equity would administer not according to the contract relations of the parties, but according to their actual relations, resulting from what they had done, and according to the nature and source of the fund, and the claims upon it. An allowance of the plea of ultra vires

cannot wipe out the contracts more thoroughly. In either case the claimant would stand before the court on a footing of equality.' And in the case of Marion Trust Co. v. Edwards Lodge Trustees, 54 N. E. 444, 153 Ind. 96, the court, in an able opinion, in which all the authorities were collated and considered, definitely adhered to the rule of law announced in the conclusion at the head of this discussion, and definitely declined to follow the decision in Towle's Case, and the decision of the federal court in Indiana in Sullivan v. Stucky. In New Hampshire, also, it has been decided that the building association contracts are not necessarily usurious. Shannon v. Dunn, 43 N. H. 194. In the case of Bank Com'rs v. Granite State Provident Ass'n, 68 N. H. 554, 44 Atl. 605, decided subsequently to Judge Grosscup's decision, the conclusion of law above stated was accepted by the court. In New Jersey it has been a number of times decided that the premiums in building associations, whether they were competitive or noncompetitive, are, under the statute of that state, not usurious. Investment Co. v. Bachelor (Ch.) 35 Atl. 745, 54 N. J. Eq. 600. Upon full consideration and definitely, although with some hesitation, the court of chancery of that state declined to follow the doctrine in Towle's Case, and adopted the rule stated in the above conclusion of law. Weir v. Association (Ch.) 38 Atl. 643, 56 N. J. Eq. 234. In the well-considered case of Leahy v. Association, decided by the supreme court of Wisconsin in October, 1898, and reported in 76 N. W. 625, 100 Wis. 555, it is assumed the premiums there charged were legally exacted, but it is held that the settlements should be made in accordance with the principles of the conclusion of law above stated. There are a great many other states in which the contracts of building associations made strictly in compliance with the law under which they are incorporated are by the terms of the statutes exempted from the prohibitions against usury. In many of these states when the asssociation has become insolvent it has been decided that the borrower is entitled to credit for all such premiums. See the cases already cited from Iowa, Michigan, Minnesota, Missouri, North Dakota, Pennsylvania, Tennessee, Texas, and Maryland.

"Judge Grosscup holds that the borrowers, being members of the association, and being as much responsible for its management as the investing members, are not entitled to treat their contracts of loan in the same way as they unquestionably would be entitled to treat them if the loans had been made to them by strangers. The supreme court of Indiana, however, well said: 'It is the ownership of stock, and nothing else, that makes borrowers and nonborrowers alike members of the association. It is upon their stock, and nothing else, and therefore in the capacity of stockholders, and not otherwise, that borrowers and nonborrowers alike were expected and entitled to receive or be credited with the division of profits. It is upon their stock, and nothing else, and therefore in their capacity of stockholders, and not otherwise, that borrowers and nonborrowers alike must be charged with losses and expenses. The nonborrowers pay only stock dues. The borrowers pay stock dues, interest, and premium. Manifestly stock dues are the only payments made by members in their capacity of stockholders. Manifestly payments of interest and premium are made by members in their capacity of borrowers. Whether the premium be considered as a bonus or as additional interest, or whether it be paid in a lump sum retained out of the loan as a result of competitive bidding at stockholders' meetings, or be paid in installments on the basis of an arbitrary percentage, whether it be paid for precedence in securing the loan or as a uniform charge upon all borrowers, in any event it is paid by the members in their capacity of borrowers. As to refuse credit for payment of premiums, receivers might as well refuse credit for payments of interest made under the contract. The contract has been abrogated by the association's insolvency. The interest that is charged the borrowers on settlement with the receiver is not the interest agreed upon in the contract. It is the interest that the law, and equity following the law, exacts for the use of money had and received; and borrowers are credited with the interest payments, not as interest, but as partial payments upon the money had and received. If premiums were not to be credited as partial payments upon the money had and received, and, if they were to remain in the account subject to losses and expenses, a non-

borrowing member who had paid in $500 on twenty-five shares of stock, and who was entitled only to the same dividends of profits as the borrowing member with twenty-five shares, would stand to lose only $500, while the borrower who had paid $500 on stock and $500 on *premium* would stand to lose $1,000. * * * Equality requires that losses shall be borne by those who have shared the profits, and in the same proportions.' Marion Trust Co. v. Edwards Lodge Trustees, 54 N. E. 444, 153 Ind. 96. Moreover, as Mr. Endlich points out, no part of the premium 'is earned until the whole scheme has been carried out.' 'A proviso requiring a return of a certain fraction of the premium for every unexpired year of a certain number of years is a rebate in favor of voluntary repayment, not an apportionment of the premium as earned or unearned.' 'Hence, if at any stage the society, breaking down, fails to perform its part of the bargain, the promise to pay it the premium loses the consideration upon which it was based, and ought to be regarded as wholly abrogated. To attempt to apportion the premium is simply to treat it as additional interest. To regard it as something which the borrower has borrowed, as something which the society has earned, and as assets in its hands, before it has done that which entitled it to retain the premium, is to misconceive its true character and office.' End. Bldg. Ass'ns (2d Ed.) § 531, p. 530.

"Eighth Conclusion of Law. That the court of appeals of Maryland has never decided that, under such contracts as those made between the defendant corporation and the intervening petitioner, the advanced member is entitled, in the event of the insolvency of the association before the maturity of his shares, to have credited on his loan the payments made by him on his stock, when and as made, according to the rule for the application of partial payments.

"Reasons in Support of the Eighth Conclusion of Law. There are five cases in Maryland in which is discussed the proper method of settlement between an advanced member and a building association or its representatives when the association has discontinued business, has been dissolved, or is insolvent. All of these cases were decided before the defendant corporation, the Baltimore Building & Loan Association, was chartered. They are: (1) Windsor v. Bandel, 40 Md. 172, decided in May, 1874; (2) Association v. Zucker, 48 Md. 448, decided in March, 1878; (3) Association v. Jaecksch, 51 Md. 198, decided in March, 1879; (4) Association v. King, 58 Md. 279, decided in April, 1882; (5) Association v. Buck, 64 Md. 340, 1 Atl. 561, decided in November, 1885. In the first, fourth, and fifth of the above cases the associations were not, strictly speaking, insolvent. Their free shareholders had decided to discontinue business. This decision was not, so far as appears from the record, taken because the associations had become insolvent, but because, for one reason or another, the free shareholders had become tired of the enterprises, and deemed it more expedient for their interests to wind them up than to carry them on to the end. The difficult problem in the winding up of dissolved or insolvent associations is to so adjust the equities between the borrowing and the investing stockholders as to do justice to each. Where insolvency comes upon all alike, it would seem, for the reasons to be stated under the ninth conclusion of law, inequitable to the investing shareholders to require them to bear all the losses. From an equitable standpoint the situation is by no means precisely the same where the investing shareholders, for their own purposes, or in accordance with their own judgment, decide that they will wind up the association without being compelled to do so. In such case there is every equity in saying, as the court of appeals of Maryland said, in effect: 'Very well. You all agreed that the association should continue until the shares became worth their par value. Upon the faith of this agreement the borrowing members took their advances. When they took their advances they were promised a release when their shares matured, provided until that period arrived they paid their weekly or monthly installment. They did not assume to make any other payments, or to pay the principal of their debt, or any part of that principal, except in the manner just stated. Now, you have said, "We will not mature our shares, and we will so act that you cannot mature yours." Very well. If that be your will, so let it be; but by so

doing you have abrogated the contract of membership, as well as the contract of loan. All the relation between the advanced member and the association which then remains is the implied contract growing out of the fact that each party has received money of the other for which he and it must in equity and good conscience account as for money had and received.' The case in Massachusetts usually cited as concurring with the Maryland courts was a case where the facts were similar to those in the three Maryland cases referred to. Cook v. Kent, 105 Mass. 246. It is true that the distinction between the voluntary dissolution of an association at the instance of its free shareholders and its insolvency has not been usually taken. The courts and the text writers have ordinarily, if not always, assumed that cases of voluntary dissolution or stoppage of business were legally indistinguishable from cases of insolvency, in their effect upon the rights of the different classes of shareholders among themselves. Yet there is a difference. Where the dissolution or the ceasing to do business is the result of the deliberate action of the free shareholders, or indeed of any shareholder except the one who is in the particular case resisting the attempt to enforce against himself obligations which had been in whole or in part repudiated by the controlling membership of the association, there is no just reason for holding him responsible for a share of the losses and expenses resulting from such winding up. The reason why in cases of ordinary insolvency the advanced member should be held responsible, as stated by Judge Grosscup in the case of Towle v. Society (C. C.) 61 Fed. 446, is that as all the members, advanced or unadvanced, have their voice in the control of the association, they are all alike responsible for its insolvency, and should all alike bear their fair share of its losses. That reason does not apply where the advanced member had no part or lot in bringing about the dissolution. The two other Maryland cases above cited, viz. Association v. Zucker and Association v. Jaecksch, were cases of insolvent building associations. In those cases it did not appear that the advanced members had, either by their contracts or by the by-laws of the association, assumed any direct responsibility or liability for its losses. The by-laws of the defendant association expressly declare that the losses shall, if they exceed the undivided profits, be charged pro rata against the various shares. See By-Laws 1891, art. 6, § 4; Id. 1899, art. 7, § 6. There have been losses which have not only absorbed all the undivided profits, but have greatly impaired the capital of the defendant corporation. The by-law was reasonable. It was just. If the association had not become insolvent this by-law would have been binding on all the members. There does not seem to be any reason in the nature of things why it should become ineffective so far as the advanced members were concerned merely because the losses were so large as to make the association insolvent.

"There is one argument which may be made against the equity of the conclusion of law above stated. The records of the above cases greatly limit the effect of the decisions of the court of appeals of Maryland. It cannot be questioned, however, that text writers and courts of other states have, in all their discussions as to what is the proper rule of settlement of the accounts between an advanced member and an insolvent association, said or assumed that in Maryland in such case the advanced member was entitled to credit on his loan all the payments he had made to the association, whether as stock dues, premium, or interest. At the time the defendant corporation was chartered and the intervening petitioner entered into his contracts, such statements could be found in the books. End. Bldg. Ass'ns (1st Ed.) p. 507. It is therefore possible that, had any of the members of the defendant corporation before taking an advance from it consulted counsel as to what their rights would be in case the association became insolvent before the maturity of their loans, they might have been told that in such event everything they paid in to the association would be credited on their debt. Yet, if the advice he sought had been of the best, he would doubtless have had his attention called to the fact that in none of the Maryland cases did it appear that the association had such a by-law as that which was binding on the members of the association from which he was seeking an advance. It seems, therefore, both legally sound and actually just to hold that nothing which the Maryland courts have decided compels this court in this case to

give credit to the intervening petitioner for the payments he has made as dues on his stock. As has already been mentioned, if the conclusion of law above stated is correct there is no conflict between the doctrine of the case of Robertson v. Association, 10 Md. 397, 69 Am. Dec. 145, and that of the subsequent cases in which excessive payments for interest or premium are treated as usurious. The doctrine of that case, as explained in the case of Association v. McCarthy, 57 Md. 555, does not permit the crediting on the loan of the payments made as dues as and when such payments are made. Of course, the payments on the dues are ultimately and indirectly to be applied to the liquidation of the debt, but such application is to be made only when the shares mature. That is to say, such payments, when made, and until the ultimate maturity of the stock, are a part of the common fund of the association, entitled to share in its profits, and bound to bear its losses.

"Ninth Conclusion of Law. That the intervening petitioner is not entitled to credit on the account between himself and the defendant association and its receivers for the amount paid in by him as dues upon the shares of stock pledged as collateral security for the loans or advances made to him by the defendant corporation.

"Reasons in Support of the Ninth Conclusion of Law. The intervening petitioner first became a free or unadvanced stockholder. There is no direct evidence in this case that at the time he did so he expected to apply for a loan. It is true, however, that his applications for his loans were in each case made so shortly after the time he subscribed for his stock as to make it highly probable that his purpose in subscribing for the stock was to obtain such advances. No inquiry has been made as to what the intervening petitioner's intentions at the time of his becoming a stockholder were, because it is believed that no possible result of such inquiry could be material to any issue properly in this case. Whatever his motives for becoming a stockholder were, the fact remains that he did take stock. There was nothing oppressive in the corporation's action in accepting him as such stockholder. No matter what his purpose in becoming a stockholder was, he could have changed that purpose if he had seen fit before he applied for an advance, and the corporation could not have complained. The fact that his controlling motive in becoming a shareholder may have been to qualify himself to obtain an advance has no material bearing upon his rights. The authorities are practically unanimous in this conclusion. It is only necessary to cite a couple as fair examples of the rest: Reynolds v. Association, 29 S. E. 187, 102 Ga. 126; Freeman v. Association, 114 Ill. 182, 28 N. E. 611. In becoming a shareholder the intervening petitioner agreed that all the money he paid in as shareholder should be at the common risk of the enterprise. When the intervening petitioner became a stockholder the by-laws of the association provided that against the value of his shares should be charged his portion of any loss which the association might suffer while he remained a member thereof. By-Laws 1891, § 4, art. 6. There seems to be no reason in the nature of things why this agreement should cease to be binding upon him simply because subsequently to becoming a member of the corporation and a stockholder therein he borrowed money on his shares. It is clear that if he be given credit on his loan for all his payments of dues upon stock as and when they are made, and because they were dues, this provision of the by-laws as to him would become absolutely non-effective, and he would be relieved from his obligation to bear his share of such losses as the corporation might incur. We are not dealing with the obligations resulting from his contracts of loan. Nor are we considering whether they were in any respect illegal, usurious, or oppressive, or whether, although not illegal, usurious, or oppressive, the circumstances have been so changed by the insolvency of the association as to relieve him from the whole or from any part of his obligation thereunder. Those problems have been considered in this report in other connections. As shareholder, and in respect to those sums which he paid at precisely the same time, in precisely the same amounts, as the unadvanced stockholders, he would not seem to be, on any principle of law or of equity, entitled to stand in any other position than do the unadvanced shareholders.

"The conclusion of law above stated is supported by the great weight of

American authority. It is the law in the following states, viz.: (1) Connecticut. Curtis v. Association, 36 Atl. 1023, 69 Conn. 6. (2) Georgia. Association v. Goodrich, 48 Ga. 450. (3) Illinois. Choisser v. Young, 69 Ill. App. 252. (4) Indiana. Marion Trust Co. v. Edwards Lodge Trustees, 54 N. E. 444, 153 Ind. 96. (5) Iowa. Wilcoxen v. Smith, 78 N. W. 217, 107 Iowa, 555. (6) Kentucky. Rogers v. Rains, 38 S. W. 483, 100 Ky. 295. (7) Michigan. Russell v. Pierce, 80 N. W. 118. (8) Minnesota. Knutson v. Association, 69 N. W. 889, 67 Minn. 201. (9) Missouri. Brown v. Archer, 62 Mo. App. 277. (10) New Jersey. Weir v. Association, 38 Atl. 643, 56 N. J. Eq. 234. (11) New York. People v. Lowe, 22 N. E. 1016, 117 N. Y. 175. (12) North Carolina. Meares v. Duncan, 123 N. C. 203, 31 S. E. 476. (13) North Dakota. Hale v. Cairns, 77 N. W. 1010, 8 N. D. 145. (14) Ohio. Eversmann v. Schmitt, 41 N. E. 139, 29 L. R. A. 184. (15) Pennsylvania. Strohen v. Association, 8 Atl. 843, 115 Pa. 273. (16) Tennessee. Rogers v. Hargo, 20 S. W. 430, 92 Tenn. 35. (17) Texas. Blakeley v. Association (Tex. Civ. App.) 26 S. W. 292. (18) Wisconsin. Leahy v. Association, 76 N. W. 625, 100 Wis. 555. And of federal courts in the Northern district of Illinois (Towle v. Society [C. C.] 61 Fed. 446); district of Indiana (Sullivan v. Stucky, 86 Fed. 491); circuit court of appeals for the Sixth circuit (Douglass v. Kavanaugh, 33 C. C. A. 107, 90 Fed. 373); Western district of North Carolina (McIlwaine v. Iseley [C. C.] 96 Fed. 62); Southern district of Alabama (Manorita v. Trust Co. [C. C.] 101 Fed. 8). In a few cases the opposite doctrine has been laid down. In Association v. Shea, 55 Pac. 1022, an Idaho court held that 'although the relation between the corporation and its stockholders is distinct from that between it and its debtors, whether stockholders or not, the entire contract is one of loan, and the relation of corporation and stockholder exists not in fact, but purely in fiction.' In this case the corporation was still a going concern, and it does not appear that there had been any losses. The Maryland cases have been considered in the discussion under the eighth conclusion of law. In the Massachusetts case of Cook v. Kent, 105 Mass. 246, the terms of the mortgage expressly provided that the payments on the stock should be 'applied in liquidation of said principal sum.' In Randall v. Protective Union,—a Nebraska case reported in 60 N. W. 1019, 42 Neb. 809, 29 L. R. A. 133, and again in 62 N. W. 252,—all that was decided was that when the association was a going concern, and had itself terminated the borrower's membership, the borrower was entitled to credit on his loan the present value of his shares, and that upon the facts in that case as stated in the record the value of the shares was equivalent to the sum which had been paid on them. In Buist v. Bryan, 21 S. E. 537, 44 S. C. 121, 29 L. R. A. 127, the supreme court of South Carolina distinctly repudiated the doctrine of the conclusion of law above stated, as did the supreme court of Utah in the cases of Sawtelle v. Building Co., 48 Pac. 211, 14 Utah, 443; Hale v. Thomas, 59 Pac. 241, 20 Utah, 426; Howells v. Building Co., 60 Pac. 1025. The house of lords, in the cases of Brownlie v. Russell. 8 App. Cas. 235, and Tosh v. Association, 11 App. Cas. 489, held that under the contracts and by-laws before it the borrowing shareholders were entitled, although the associations were insolvent, to a credit upon their indebtedness for all sums paid in by them as dues upon their stock. In Brownlie v. Russell the contract expressly provided that the advance should be repaid by monthly installments. It was pointed out by Lord Bramwell in the first case, and by Lord Chancellor Herschel in the second, that there was not one word in the by-laws as to losses; and consequently there was no such requirement as there was in the by-laws of this defendant corporation, that the advanced shareholders should be charged, as against their shares, with their portion of the losses. In both the British cases the by-laws of the association provided that upon the member paying up his unpaid installments he would be entitled to a release. The intervening petitioner is therefore in a different situation from that of the borrowing members in these British cases. In the latter, however, there was laid down one doctrine of general application, which may be briefly summarized as follows: The building association scheme requires two classes of shareholders,—the advanced and the unadvanced. The same man, as to the same shares, can never be at the same time in both classes. When he obtains an advance he passes from one class definitely into the other, and all the contracts he has had with the associa-

tion as a free shareholder become merged in the new contract he makes as an advanced shareholder. It is not possible to distinguish between his relations as stockholder and borrower. No shareholder in any corporation, in the absence of special statutory requirement, can in any event be required to pay as shareholder more than the par value of his shares. When the advanced shareholder in a building association has once paid to the association the par value of his shares, with interest on his advance, he has paid all that the association can demand from him. It matters not whether it has suffered losses or not. If it has, he is no more liable to contribute towards them than is the holder of the full-paid stock of any other corporation which may become insolvent. This reasoning has unquestioned force, and yet the American theory that the advanced member's contract of membership is not merged in his contract of loan appears, after all, more logical. In its results it is certainly more equitable. If the contracts are treated as separate, the borrowing member will not pay on his stock more than the par value of his shares. He may not, it is true, be able to apply all his stock payments to the settlement of his debt, but as stockholder his liability can never exceed the par value of his shares. As has been already pointed out, the doctrine of the case of Robertson v. Association, 10 Md. 397, 69 Am. Dec. 145, and the cases which follow it, can be logically harmonized with that of the other long series of Maryland cases which have held usurious many building association contracts with their advanced members, by recognizing that payments on the stock are not in themselves directly payments on the loan. The English rule that in cases where the association has become insolvent all payments by the advanced member to the association are to be credited as against his advance has, it must be admitted, one practical merit of great importance. By it the prompt and therefore cheap settlement of the affairs of such an association is facilitated. The accounts between the association and every one of its advanced members can be struck at once finally and with absolute precision. No rule which does not permit the crediting of dues on the loan can have any such result, for until all the assets are finally collected it is impossible to say what will be the percentage of loss which each stockholder will suffer, and therefore the amount coming to each stockholder as a dividend on his stock payments must remain uncertain. The value to all parties concerned of a prompt, certain, and relatively cheap method of settlement cannot be questioned. It does not seem right, however, to purchase it at the sacrifice of the rights of the investing members, and by applying a rule of winding up which cannot be reconciled with the mutual character of the association. The court of appeals of Maryland has declared that such an association is 'bound to treat its members equally, and any bylaw or contract made by it in contravention of such mutuality would be ultra vires and void.' Baltimore Building & Loan Ass'n v. Powhatan Imp. Co., 87 Md. 59, 39 Atl. 274.''

The receivers, the defendant Coltrane, and the complainant, a holder of full-paid stock, excepted to the third, fourth, fifth, sixth, and seventh conclusions of law, as well as to some others not above quoted, but which applied to the facts of Blake's petition the conclusions above stated. The same exceptants also filed exceptions to a few of the master's findings of fact. Blake, the intervening petitioner, and other holders of advanced shares, excepted to the first, eighth, and ninth conclusions of law, and to the subsequent conclusions which applied the principles therein stated. The master further found, as his twelfth conclusion of law, that the petitioner was not entitled to credit the admission fees paid by him upon his account with the association. To this finding no exceptions were filed.

William Hepburn Russell and Richard S. Culbreth, for complainant and receivers.

Fielder C. Slingluff, for defendant association.

Morrill N. Packard, for intervening petitioner, Blake.

Thomas Foley Hisky, Edwin J. Farber, Charles F. Harley, George H. Lamar, Douglass & Douglass, and William Pinkney Whyte, for various borrowing or advanced shareholders.

MORRIS, District Judge, after making the foregoing statement, said:

Notwithstanding the very able and learned presentation of the law by the special master under his eighth conclusion of law, I am not satisfied that there is any substantial difference in respect to the liability for losses by the borrowing shareholder between the contracts made in the present case and the contracts in the cases cited from the court of appeals of Maryland. The by-laws of the Baltimore Building & Loan Association, with regard to the rights of borrowers who paid off their loans, were quite frequently altered. Prior to 1896 the by-laws provided that a borrower could repay his loan at any time before maturity, and if at repayment he also canceled the shares on which the loan was based he should receive in settlement the full amount of dues paid, together with 6 per cent. per annum thereon for average time, but would receive no credit for premium or interest paid on account of the loan. In the by-laws of 1899 there appears an alteration by which the borrower, if he repays his loan and cancels his stock, is to receive the withdrawal value of his shares. With regard to the withdrawals prior to 1896 it was provided that the withdrawing shareholder should receive the amount paid in on his shares, together with 6 per cent. interest, but, if the losses had exceeded the profits, they should be charged up to the shares in good standing pro rata, and the amount so charged should be deducted from the amount to be paid upon withdrawal. The bonds executed by Blake and the deeds of trust executed by him provide that in case of the voluntary payment by consent of the parties, or of default and enforcement of the deed of trust, he was to be credited with the value of the shares of stock, to be determined by the board of directors according to the rule of valuation in the by-laws or by the vote of the directors. The present case is one to which the provision of the by-laws with regard to the voluntary repayment of the advance by the borrowing shareholder does not apply in terms. The considerations influencing a borrower to enter into a building association contract are principally the small periodical payments spread over a number of years. This, together with the large amount for which the property is accepted as security, are the advantages to be offset against the high rate of interest. When by insolvency of the association the loan is prematurely matured the consideration is lost, and the borrower is not in the situation of one who for his own profit voluntarily asks to be allowed to pay his loan. The case principally relied upon by the exceptants as declaring the Maryland rule as to what results flow from the insolvency of building and loan associations incorporated under the Maryland statutes, and as to the liability of the borrowing shareholder to be charged with losses, is the case of Association v. Zucker, 48 Md. 448. That was a case in which Zucker, the borrower, had covenanted to pay the stipulated weekly dues until the association had sufficient funds on hand to pay $100 for every unredeemed share of its stock, clear of all losses and liabilities. The contract made Zucker chargeable with losses, because the number of his payments was increased by

every loss. But the court of appeals declared the Maryland law to be that losses could only be taken into· account in a settlement with a borrowing shareholder when the association was a going concern, and then as an element in the estimation of how long the borrower's payments would have to continue in order to mature the stock as contemplated in the charter of the association, and that the only way in which a borrower under such a contract could be made to contribute to losses was by the prolonged or extended payment of weekly dues. In the present case the by-laws and the contract have provided for a settlement by consent of parties upon application of the borrower; also for a settlement if because of his default it became necessary to enforce the deed of trust; but no provision is made for the insolvency of the association, and its enforced winding up, and the sudden maturing of the repayment of the amounts advanced. In essentials, I can see no sufficient ground upon which to distinguish the present case from Association v. Zucker. The ruling in Zucker's Case was reaffirmed by the court of appeals of Maryland in Association v. Jaecksch (1879) 51 Md. 198.

Building and loan associations are the creatures of state statutes. It is found by the special master that by no reasonable probability could the borrowers from the Baltimore Building & Loan Association have ever escaped paying at least 13 per cent. per annum for the use of the money advanced, and only by virtue of the statutes expressly legalizing building associations is it legal in Maryland to exact over 6 per cent. for the use of money. What the state statutes allow, and what they have not granted the privilege of doing, is a question of construction, which, when settled by the Maryland courts, is controlling. And the question as to what are the mutual rights of shareholders as to each other, when such an association chartered under the Maryland law has to be wound up and its assets distributed, for the reason that such rights grow out of the special law of their incorporation, is, I think, a matter of local law, as to which the Maryland decisions control, when they have settled it. This is not a question of general commercial law or of general equity procedure, but it is a question into which enters the construction of the Maryland statute and the general policy of the Maryland law in respect to a peculiar class of contracts, only valid at all to the extent they are legalized by Maryland legislation. "The construction given a statute of a state by the highest tribunal of such state is regarded as part of the statute, and is as binding upon the courts of the United States as the text." Leffingwell v. Warren, 2 Black, 599, 17 L. Ed. 261; Bucher v. Railroad Co., 125 U. S. 555–582, 8 Sup. Ct. 974, 31 L. Ed. 795. I think it may be fairly stated that since 1878, long before the incorporation of the complainant association, it was settled in Maryland that upon a winding up the borrowing shareholder did not contribute to the losses of a building association incorporated under the Maryland law. In City of Detroit v. Osborne, 135 U. S. 492–498, 10 Sup. Ct. 1012, 34 L. Ed. 260, it was said by the supreme court, "There should be in all matters of a local nature but one law within the state, and that law is not what this court might determine, but

what the supreme court of the state has determined;" and in that case it was held that the federal court was controlled by the law settled by the courts of Michigan, contrary to the general law, that municipal corporations in Michigan were not liable for neglect to keep streets in repair. City of Richmond v. Smith, 15 Wall. 429–438, 21 L. Ed. 200; U. S. v. Morrison, 4 Pet. 124, 7 L. Ed. 804; Association v. Rector, 38 C. C. A. 686, 98 Fed. 171. In McMurray v. Gosney, 106 Fed. 11, Circuit Judge Acheson, holding the United States circuit court in Pennsylvania, in a proceeding to foreclose a mortgage of lands in Pennsylvania given by a borrowing stockholder to an Illinois building and loan association, refused to follow the Pennsylvania rule of settlement, and was controlled by the rule in Illinois.

Holding these views, I am constrained to dissent from the conclusion of the special master that the Maryland court of appeals has not decided the question of the right of the intervening petitioner to have credit for the payments made as dues upon his stock, without deduction for losses, and to sustain the exceptions of the interveners to the conclusions of the special master on that question. The conclusion which I have reached, that the Maryland rule is controlling in the winding up of this association, renders it unnecessary to consider whether, if this court were not so controlled, I would adopt the conclusion reached by the special master in his ninth conclusion of law, and which he has most ably sustained by the citations and reasons submitted by him. That conclusion and the authorities cited in its support all rest upon the assumption that the enterprises under consideration were mutual associations. Before adopting the rule found by the special master in his ninth conclusion, I should have to consider most seriously whether or not, as the association in the present case was actually carried on, any real mutuality existed between the unredeemed and the redeemed shareholders. I am entirely satisfied of the correctness of the special master's seventh conclusion of law, that the intervening petitioner is entitled to credit for all the sums paid as premium, for the reasons stated by him, and the exceptions to that conclusion are overruled. All the exceptions to the special master's findings of fact are overruled, and all the exceptions to his conclusions of law are overruled, except the exceptions to his eighth and ninth conclusions of law, and to his tenth, eleventh, and fourteenth conclusions, in which application is made of his eighth and ninth conclusions. The exceptions to such eighth, ninth, tenth, eleventh, and fourteenth conclusions are sustained to the extent indicated by this opinion.

The rule of settlement with borrowing stockholders will be as follows: (1) The amount due by the borrowing stockholder as of March 21, 1900, is to be ascertained by charging him with the amount advanced to him, with interest thereon from the time such advance was made to him, and by crediting him with the amounts paid by him for dues, premium, and interest as of the date when paid by him, according to the rule for the application of partial payments prevailing in Maryland. No credit shall be allowed him for any sums

paid as admission fees or fines. That is, the account between the defendant association and the intervening petitioner, Charles C. Blake, shall be stated in the manner in which the master has done in his report, upon the assumption that the rule in Association v. Zucker, 48 Md. 448, should be followed, a copy of which account is attached hereto as part of this opinion. By that account it appears that Blake had overpaid the association on his two loans the sum of $109.51. As to such overpayment it is equitable that Blake, to that extent, should be considered as a stockholder, and should share with the other stockholders in the dividends which may be allotted to them. (2) Upon settlement being made in accordance with the rule above stated, his stock on which the advance was obtained shall be canceled, his bonds surrendered to him, and the property conveyed by his deed of trust shall be reconveyed to him. The special master will submit a form of decree in conformity with the aforegoing ruling.

### Statement of Account.

Charles G. Blake in account with the Baltimore Building & Loan Association of Baltimore City for $1,000 advanced him by it, December 21, 1892. Account stated as in Association v. Zucker, 48 Md. 448:

| Date. | No. of Days Since Last Transaction. | Debit. | Credit. | Balance. |
|---|---|---|---|---|
| 1892. | | | | |
| Dec. 21. | .. | $1,000 00 | ...... | ....... |
| Dec. 31. | 10 | 1 64 | $ 9 32 | $992 32 |
| 1893. | | | | |
| Jan. 25. | 25 | 4 08 | 16 00 | 980 40 |
| Feb. 25. | 31 | 5 00 | 16 00 | 969 40 |
| Mar. 29. | 32 | 5 10 | 16 00 | 958 50 |
| Apr. 29. | 31 | 4 88 | 16 00 | 947 38 |
| May 27. | 28 | 4 36 | 16 00 | 935 74 |
| June 29. | 33 | 5 08 | 16 00 | 924 82 |
| July 26. | 27 | 4 10 | 16 00 | 912 92 |
| Aug. 21. | 26 | 3 90 | 16 00 | 900 82 |
| Sept. 30. | 40 | 5 92 | 16 00 | 890 74 |
| Oct. 28. | 28 | 4 10 | 16 00 | 878 84 |
| Nov. 25. | 28 | 4 04 | 16 00 | 866 88 |
| Dec. 30. | 35 | 4 99 | 16 00 | 855 87 |
| 1894. | | | | |
| Jan. 30. | 31 | 4 36 | 16 00 | 844 25 |
| Feb. 24. | 25 | 3 47 | 16 00 | 831 70 |
| Mar. 31. | 35 | 4 78 | 16 00 | 820 48 |
| Apr. 28. | 28 | 3 78 | 16 00 | 808 26 |
| May 28. | 30 | 3 99 | 16 00 | 796 25 |
| June 30. | 33 | 4 32 | 16 00 | 784 57 |
| July 28. | 28 | 3 61 | 16 00 | 772 18 |
| Aug. 29. | 32 | 4 06 | 16 00 | 760 24 |
| Sept. 29. | 31 | 3 87 | 16 00 | 748 11 |
| Oct. 29. | 30 | 3 69 | 16 00 | 735 80 |
| Nov. 24. | 26 | 3 15 | 16 00 | 722 95 |
| Dec. 31. | 37 | 4 40 | 16 00 | 711 35 |

| Date. | No. of Days Since Last Transaction. | Debit. | Credit. | Balance. |
|---|---|---|---|---|
| 1895. | | | | |
| Jan. 28. | 28 | 3 27 | 16 00 | 698 62 |
| Feb. 26. | 29 | 3 33 | 16 00 | 685 95 |
| Mar. 27. | 29 | 3 27 | 16 00 | 673 22 |
| Apr. 29. | 33 | 3 65 | 16 00 | 660 87 |
| May 25. | 26 | 2 82 | 16 00 | 647 69 |
| June 24. | 30 | 3 19 | 16 00 | 634 88 |
| July 31. | 37 | 3 86 | 16 00 | 622 74 |
| Aug. 30. | 30 | 3 07 | 16 00 | 609 81 |
| Sept. 30. | 31 | 3 11 | 16 00 | 596 92 |
| Oct. 22. | 22 | 2 16 | 16 00 | 583 08 |
| Nov. 25. | 34 | 3 26 | 16 00 | 570 34 |
| Dec. 28. | 33 | 3 09 | 16 00 | 557 43 |
| 1896. | | | | |
| Jan. 27. | 30 | 2 75 | 16 00 | 544 18 |
| Feb. 26. | 30 | 2 68 | 16 00 | 530 86 |
| Mar. 30. | 33 | 2 88 | 16 00 | 517 74 |
| Apr. 27. | 28 | 2 38 | 16 00 | 504 12 |
| May 26. | 29 | 2 40 | 16 00 | 490 52 |
| June 27. | 32 | 2 58 | 16 00 | 477 10 |
| July 25. | 28 | 2 20 | 16 00 | 463 30 |
| Aug. 29. | 35 | 2 67 | 16 00 | 449 97 |
| Sept. 26. | 28 | 2 07 | 16 00 | 436 04 |
| Oct. 31. | 35 | 2 51 | 16 00 | 422 55 |
| Nov. 28. | 28 | 1 95 | 16 00 | 408 50 |
| Dec. 26. | 28 | 1 88 | 16 00 | 394 38 |
| 1897. | | | | |
| Jan. 30. | 35 | 2 27 | 16 00 | 380 65 |
| Feb. 27. | 28 | 1 75 | 16 00 | 366 40 |
| Mar. 27. | 28 | 1 69 | 16 00 | 352 09 |
| Apr. 24. | 28 | 1 62 | 16 00 | 337 71 |
| May 29. | 35 | 1 94 | 16 00 | 323 65 |
| June 26. | 28 | 1 49 | 16 00 | 309 14 |
| July 30. | 34 | 1 73 | 16 00 | 294 87 |
| Aug. 28. | 29 | 1 40 | 16 00 | 280 27 |
| Sept. 25. | 28 | 1 29 | 16 00 | 265 56 |
| Oct. 30. | 35 | 1 53 | 16 00 | 251 09 |
| Nov. 27. | 28 | 1 16 | 16 00 | 236 25 |
| Dec. 25. | 28 | 1 09 | 16 00 | 221 34 |
| 1898. | | | | |
| Jan. 29. | 35 | 1 27 | 16 00 | 206 61 |
| Feb. 26. | 28 | 95 | 16 00 | 191 56 |
| Mar. 26. | 28 | 88 | 16 00 | 176 44 |
| Apr. 30. | 35 | 1 01 | 16 00 | 161 45 |
| May 28. | 28 | 74 | 16 00 | 146 19 |
| June 25. | 28 | 67 | 16 00 | 130 86 |
| July 30. | 35 | 75 | 16 00 | 115 61 |
| Aug. 27. | 28 | 53 | 16 00 | 100 14 |
| Sept. 24. | 28 | 46 | 16 00 | 84 60 |
| Oct. 29. | 35 | 49 | 16 00 | 69 09 |
| Nov. 26. | 28 | 32 | 16 00 | 53 41 |
| Dec. 31. | 35 | 31 | 16 00 | 37 72 |
| 1899. | | | | |
| Jan. 28. | 28 | 17 | 16 00 | 21 89 |
| Feb. 25. | 28 | 10 | 16 00 | 5 99 |
| Mar. 25. | 28 | 03 | 16 00 | ...... |
| | | $1,199 34 | $1,209 32 | |

Balance overpaid, $9.98, carried to account of advance of $300.

Charles G. Blake in account with Baltimore Building & Loan Association of Baltimore City for $300 advanced him by it June 21, 1895. Account stated as in Association v. Zucker, 48 Md. 448:

| Date. 1895. | No. of Days Since Last Transaction. | Debit. | Credit. | Balance. |
|---|---|---|---|---|
| May 25. | .. | ...... | $ 1 80 | ...... |
| June 21. | 27 | $300 00 | 01 | $298 19 |
| June 24. | 3 | 15 | 1 80 | 296 54 |
| July 31. | 37 | 1 80 | 5 70 | 292 64 |
| Aug. 30. | 30 | 1 44 | 5 70 | 288 38 |
| Sept. 30. | 31 | 1 47 | 3 90 | 285 95 |
| Oct. 22. | 22 | 1 03 | 4 80 | 282 18 |
| Nov. 25. | 34 | 1 58 | 4 80 | 278 96 |
| Dec. 28. | 33 | 1 51 | 4 80 | 275 67 |
| **1896.** | | | | |
| Jan. 27. | 30 | 1 36 | 4 80 | 272 23 |
| Feb. 26. | 30 | 1 34 | 4 80 | 268 77 |
| Mch. 30. | 33 | 1 46 | 4 80 | 265 43 |
| Apr. 27. | 28 | 1 22 | 4 80 | 261 85 |
| May 26. | 29 | 1 25 | 4 80 | 258 30 |
| June 27. | 32 | 1 36 | 4 80 | 254 86 |
| July 25. | 28 | 1 17 | 4 80 | 251 23 |
| Aug. 29. | 35 | 1 45 | 4 80 | 247 88 |
| Sept. 26. | 28 | 1 14 | 4 80 | 244 22 |
| Oct. 31. | 35 | 1 40 | 4 80 | 240 82 |
| Nov. 28. | 28 | 1 11 | 4 80 | 237 13 |
| Dec. 26. | 28 | 1 09 | 4 80 | 233 42 |
| **1897.** | | | | |
| Jan. 30. | 35 | 1 34 | 4 80 | 229 96 |
| Feb. 27. | 28 | 1 06 | 4 80 | 226 22 |
| Mch. 27. | 28 | 1 04 | 4 80 | 222 46 |
| Apr. 24. | 28 | 1 02 | 4 80 | 218 68 |
| May 29. | 35 | 1 26 | 4 80 | 215 14 |
| June 26. | 28 | 99 | 4 80 | 211 33 |
| July 31. | 35 | 1 22 | 4 80 | 207 75 |
| Aug. 28. | 28 | 96 | 4 80 | 203 91 |
| Sept. 25. | 28 | 94 | 4 80 | 200 05 |
| Oct. 30. | 35 | 1 15 | 4 80 | 196 40 |
| Nov. 27. | 28 | 90 | 4 80 | 192 50 |
| Dec. 25. | 28 | 88 | 4 80 | 188 58 |
| **1898.** | | | | |
| Jan. 29. | 35 | 1 08 | 4 80 | 184 86 |
| Feb. 26. | 28 | 85 | 4 80 | 180 91 |
| Mch. 26. | 28 | 83 | 4 80 | 176 94 |
| Apr. 30. | 35 | 1 02 | 4 80 | 173 16 |
| May 28. | 28 | 80 | 4 80 | 169 16 |
| June 25. | 28 | 78 | 4 80 | 165 14 |
| July 30. | 35 | 95 | 4 80 | 161 29 |
| Aug. 27. | 28 | 74 | 4 80 | 157 23 |
| Sept. 24. | 28 | 72 | 4 80 | 153 15 |
| Oct. 29. | 35 | 88 | 4 80 | 149 23 |
| Nov. 26. | 28 | 69 | 4 80 | 145 12 |
| Dec. 31. | 35 | 83 | 4 80 | 141 15 |
| **1899.** | | | | |
| Jan. 28. | 28 | 65 | 4 80 | 137 01 |
| Feb. 25. | 28 | 63 | 4 80 | 132 84 |
| *Mch. 25. | 28 | 61 | 14 78 | 118 67 |
| Apr. 29. | 35 | 68 | 20 80 | 98 55 |
| May 27. | 28 | 45 | 20 80 | 78 20 |
| June 29. | 28 | 36 | 20 80 | 57 76 |
| July 29. | 35 | 33 | 20 80 | 37 29 |
| Aug. 26. | 28 | 17 | 20 80 | 16 66 |
| Sept. 30. | 35 | 08 | 20 80 | ...... |
| | | $351 22 | $355 28 | |

*See * note on opposite page.

Overpayments, with dates, number of days prior to the 21st of March at which they were made to the association, and simple interest thereon to March 21, 1900:

| Dates. | No. of Days. | Payments. | Int. Thereon. |
|--------|--------------|-----------|---------------|
| Sept. 30. | 168 | $ 4 06 | $0 11 |
| Oct. 28. | 140 | 20 80 | 46 |
| Nov. 25. | 112 | 20 80 | 37 |
| Dec. 30. | 77 | 20 80 | 25 |
| Jan. 27. | 49 | 20 80 | 17 |
| Feb. 24. | 25 | 20 80 | 09 |
|  |  | .$108 06 | $1 45 |
| Interest .............................. |  | 1 45 |  |

Total interest and principal........$109 51

*Note. From March 25, 1899, there is credited on this account the payments made by the intervening petitioner on both his loans, the loan of $1,000 having been, according to the account stated upon this theory, completely paid up by the payment made March 25, 1899.