## CLARKE V. CONNERS *et al.*

1. Where a premium exacted from a borrowing stockholder in a building association was not fixed by competitive bidding, as required by the by-laws and Rev. Civ. Code, § 816, and the amount of premium and interest was in excess of the legal rate, the excess was applicable to the principal obligation.

2. In a suit to foreclose a mortgage given to a building association, evidence considered, and held to warrant a finding that the premium paid by the borrowing stockholder was fixed arbitrarily by the association, and not determined by competitive bidding.

3. To overcome the presumption that facts found by the trial court are fully justified, a preponderance of evidence against such findings must clearly appear from the record on appeal.

(Opinion filed December 7, 1904.)

Appeal from circuit court, Lawrence county; Hon. W. G. RICE, Judge.

Action by M. C. Clarke, as receiver of the American Savings & Loan Association, against Milton C. Conners, Jr., as executor of the last will of Milton C. Conners, deceased, and others. From a judgment in favor of defendants plaintiff appeals. Affirmed.

*Frawley & Frawley*, for appellant.

*Chambers, Kellar, Moody & Moody*, for respondents.

FULLER, J.  From the evidence introduced at the trial of this action, instituted by the receiver of an insolvent building association to foreclose a mortgage for $2,000 given by Milton C. Conners, since deceased, the court found, among other things and in substance, that the American Building & Loan Association, subsequently changed to the American Savings & Loan Association, was organized under the laws of Minnesota, and carried on such business as its corporate name suggests until the 14th day of January, 1896, prior to which its officers had become guilty of certain violations of law by reason of which the assosiation became insolvent, and unable to perform its contracts or mature its stock, or otherwise carry on the business for which it was created.  For the sole purpose of secuing a loan of $2,000, Milton C. Conners, of Lawrence county, Dak. T., became a member of the association, subscribing for 40 shares of capital stock, of the par value of $100 each, all of which were thereupon assigned to the association as collateral security, to become the absolute property of the association when matured by specified monthly payments sufficient in the aggregate to make each share actually worth $100.

So far as need be quoted, the findings of fact are as follows: "That about March 16, 1889, said Milton C. Conners, deceased, made his application to said assuciation, in writing, for the said loan of two thousand dollars, by way of anticipation of the value of said shares of stock at their maturity. That under the by-laws of said association loans were to be awarded to stockholders only after competitive bidding.  That for a long time prior to November 13, 1889, the said association had not awarded its loans upon any competitive bidding of any kind or character, but that a fixed premium of fifty dol-

lars per share was required from all applicants for a ·loan. That at the time that the said Milton C. Conners, deceased, became a member in said association and subscribed for said stock, he was notified by the said association that a bid of fifty dollars per share would be exacted ·or required of him in order to obtain his desired loan of two thousand dollars. That as a matter of fact the said American Building and Loan Association did arbitrarily fix the sum of fifty dollars as an absolute fixed sum to be paid by the said Milton C. Conners as · a premium or a condition of his obtaining said · loan of two thousand dollars. That there was no competition whatever of any kind or character between the applicants for loans or between the stockholders, nor was there any bidding whatsoever, but that said exaction or premium was arbitrarily fixed in advance, and the same fixed premium was charged of all persons desiring to make a loan. That the said Milton C. Conners, in order to obtain said loan of two thousand dollars, was in the manner aforesaid compelled and forced to obligate himself to pay said association, in addition to the repayment of said two thousand dollars, with interest thereon at six per cent., the additional sum of two thousand dollars, or a premium of fifty dollars per share on said forty shares, in accordance with the terms of the bond at the time executed by said Conners, and a copy of which is hereafter set out. That the rate of interest which the said Milton C. Conners, deceased, was thus obliged to pay to the said association was about twenty-one per cent. per annum, and greater than the rate of twelve per cent. as allowed by the statutes of South Dakota, or of ten per cent. as allowed by the statutes of Minnesota. *. * * That the American Building and Loan Association paid to the said Mil-

ton C. Conners, deceased, the sum of two thousand dollars, which was all the money or consideration of any character whatsoever received by said Conners in consideration of the execution and delivery of said bond and the mortgage securing the same. That the said arrangement and agreement between the said Milton C. Conners, deceased, and the American Building and Loan Association was a mere trick and device concocted by the said association, knowingly, for obtaining usurious rates of interest upon and for the loaning of money, and that said association has already received, as hereinafter found, the principal sum advanced by it and eight hundred and eighty-four dollars as interest, being more than said association was entitled to receive.   *   *   *   That there has been paid by said Milton C. Conners, deceased, and by the defendant Milton C. Conners, Jr., executor of the last will and testament of said Milton C. Conners, deceased, upon said bond and mortgage described in plaintiff's complaint, an aggregate sum of two thousand nine hundred and twenty-four dollars; that is, the sum of $2,064, as dues upon the said stock, being dues for the months of December, 1888, to January, 1896, both inclusive, and the further sum of $860 as interest upon the loan of money made to the said Milton C. Conners, deceased, by said association, being the full payment of interest thereon up to and including the months of January, 1896, and also the further sum of $40 admission fee. That said Milton C. Conners, deceased, by the terms and conditions of said bond, was required to, and as a matter of fact did, assign, transfer, and deliver to the said association all of said shares of stock as additional collateral security for the payment of said advancement or loan. That said Milton C. Conners, deceased, com-

plied with his contract as to the payment of stock dues, interest, premiums, and as to all matters until the insolvency of said American Building and Loan Association, at that time known as the American Savings and Loan Association. * * * That at the time of the execution and delivery of said bond and mortgage the American Building and Loan Association had not made any application to the Secretary of the Territory of Dakota for permission to do business in said territory, and had not obtained any certificate authorizing said association to do business in said territory, as provided in section 2, c. 41, p. 60, Laws 1889, passed at the Eighteenth Session of the Legislative Assembly of the Territory of Dakota, entitled 'An act regulating the business of building and loan corporations,' and had not in any particular complied with the provision of said law. That at the time of the execution and delivery of said bond, mortgage, and the subscription for said stock by Conners, and the negotiations for said loan, the said association had not complied with any of the laws of the state of South Dakota relative to foreign building associations."

Under the by-laws of the association and the statute in force at all times essential to this case, funds in the treasury could be loaned only to the stockholder offering ample security and bidding the highest premium in open meeting for the preference or prior right of loan. Section 816, Rev. Civ. Code. Unless the premium of $50 per share was determined by competitive bidding at the time the loan was negotiated, the aggregate amount paid as premium, together with the stipulated interest, being much greater than the legal rate, the excess must be regarded as usurious, and the trial court was fully justified in applying the same in satisfaction of the principal obli-

gation. Iowa Savings and Loan Association v. Heidt, 107 Iowa 297, 77 N. W. 1050, 43 L. R. A. 689, 70 Am. St. Rep. 197; Post v. Mechanics' Building & Loan Association, 37 S. W. 216, 34 L. R. A. 201; Jamieson v. Jurgens, 195 Ill. 86, 62 N. E. 917; Stile's Appeal, 95 Pa. 122; Fry v. Missouri Guarantee Savings & Loan Association, 88 Mo. App. 289; Coltrane v. Baltimore Building & Loan Association (C C.), 110 Fed. 293; Weir v. Granite State Provident Ass'n, 56 N. J. Eq. 234, 38 Atl. 643; Western Loan & Savings Co. v. Houston, 65 Pac. 611; 6 Cyc. 149.

Such being the law it becomes necessary to decide whether the evidence is sufficient to sustain the finding that the premium the borrower was required to pay was arbitrarily fixed by the association at $50 per share, instead of being determined by open competitive bidding. W. H. Harlow a local agent of the association, who assisted its traveling agent C. S Crysler in making this loan, testified that the stock in the association was taken by Mr. Conners for the purpose of making a loan, and that his attention was called at the time to a statement contained in the pamphlet of the loan association, as follows: "Premium bids are now running about $50.00 per share. At this rate two shares of stock are required to be held for each $100.00 loaned. The cost of a loan at this premium with interest added is $1.70 per month for each $100.00." Mr. Bishop, who was at all times closely connected with the association as one of its principal officers, and evidently very familiar with the details of the business, testified in part as follows: "Q. Did or did not any authorized officer, agent, or employee of the association ever represent to Milton C. Conners that, in order to procure or obtain a loan of $2,000 from the association, it

would be necessary that the said Conners should subscribe for 40 shares of the capital stock of the association? A. It was a rule of the association that a member could not borrow more than one half of the matured value of his stock; therefore, if a man was a member of the association, it would be proper for an officer or agent to represent to him that he could not borrow over $2,000 upon it, and I think all the officers and agents were authorized to make such statement. The applications for loans and bids were opened and submitted to the loan committee, consisting of five members and the board of directors, and, if there were enough bids to take the money that the association had for the purpose of loaning at the premium of 50 per cent. or more, then all the bids below that were rejected, and they then secured appraisals on the value of the property offered for security, and if that was satisfactory, the party was notified that his loan was accepted, and they were required to make the loan, the title being good. As a rule, they had enough applications at 50 per cent. and over to take all the money that they had to loan, although some few loans were made in the early history of the association for less. Q. Was it generally understood at this time—March, 1889—with the association and among its agents, that no bid for a loan would probably be accepted unless it was at least 50 per cent. premium? A. I could not say as to the understanding among the agents; the understanding was among the board of directors that they were obliged to accept no loans for less than 50 per cent., as they could get other bids for all the money they wanted to loan; but there was no requirement that a member should bid that, or less, or more. The bids we received about that time were almost entirely at a premium of $50 or more. No,

sir, I have no personal recollection of the loans in and about Spearfish, S. D.   *   *   *   The majority of these loans were made at a premium of $50 per share; that was the acknowledged premium that could be secured; they had no occasion to loan their money at a less premium than that.   We had few offers in proportion to the number of members at a higher premium; we had offers as high as 90 per cent.   *   *   *   Q. What was the reason that most of the loans were made at a bid of $50 per share?   A. The association had a sufficient number of applications at that premium to use for that purpose all the money it had in the loan fund for the purpose of loaning to members from time to time; that it was found on examination of the values and titles of property offered, where higher bids than $50 per share were made, they were not safe loans.'' While this witness made some general statements inconsistent with the foregoing testimony, it seems reasonably clear from authorized representations made by agents to prospective borrowers, and the tacit understanding of the board of directors, that the premium was arbitrarily fixed at 50 per cent. and neither a higher nor a lower bid would receive favorable consideration.

In order to overcome the presumption that facts found by the trial court are fully justified, a preponderance of evidence against such findings must clearly appear from the record presented on appeal.   Randall v. Burk Township, 4 S. D. 337, 57 N. W. 4; Feldman v. Trumbower, 7 S. D. 408, 64 N. W. 189; Reagan v. McKibben, 11 S. D. 270, 76 N. W. 943; Littlejohn v. County Line Creamery Co., 14 S. D. 312, 85 N. W. 588; Krueger v. Dodge, 15 S. D. 159, 87 N. W. 965.   The evidence upon the point under consideration is practically undisputed, and

the finding to the effect that the amount of premium was fixed by the association instead of being determined by competitive bidding cannot be disturbed.

Since the statute contemplates a premium bid of a definite amount to be offered for a loan in open meeting at a time stated, and that the highest and best bidder shall be entitled to receive a loan equal in amount to the par value of his shares of stock, it is the plain duty of courts to protect our citizens from usurious extortion, however concealed, and the judgment appealed from is affirmed.